NOT DESIGNATED FOR PUBLICATION

No. 121,808

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of P.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed June 5, 2020.
Affirmed.

*Michael E. Lazzo*, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., MALONE AND GARDNER, JJ.

PER CURIAM: S.H. (Father) appeals the district court's finding that he is unfit to parent his daughter, P.H. Father argues that there is insufficient evidence to support the district court's findings and that the State failed to plead the facts properly for which the district court terminated his parental rights.

The record reflects that although Father completed court ordered tasks, Father failed to implement secondary change. Additionally, a review of the record shows the State alleged the facts and grounds necessary to find Father lacked effort in adjusting his circumstances, conduct, or condition to meet the needs of P.H., and the district court's finding is supported by the record. Because there is clear and convincing evidence to support the district court's ruling, we affirm.

1

A.H. (Mother), age 28, gave birth to P.H. in February 2018. Immediately following the birth, police placed P.H. in protective custody because of Mother's "history" and safety concerns of hospital staff. Although not explicitly explained, the concerns about Mother's "history" involve Mother's involuntary manslaughter conviction for the brutal death of her two-year-old daughter in 2012. She also had another child for whom she relinquished her parental rights after leaving the child with caregivers for long periods of time and physical abuse.

The district court held a temporary custody hearing a few days later, and Father, age 17 and living with his mother, appeared at the hearing. The district court ordered P.H. to remain in the temporary custody of the Department of Children and Families (DCF). The court also adopted the State's proposed orders. These orders included that Father should: (1) abstain from the use of illegal drugs or alcohol; (2) obtain and maintain full-time employment; (3) obtain and maintain appropriate housing; (4) complete a clinical interview and assessment, anger management classes, parenting classes, and a substance abuse evaluation; and (5) participate in hair follicle testing as scheduled and random urinalysis testing.

Four months later, Mother and Father submitted no-contest statements, and the district court adjudicated P.H. as being a child in need of care. The district court ordered P.H. to remain in the custody of DCF.

Less than a month after the adjudication hearing, the State moved for a finding of unfitness and termination of parental rights for both parents. The motion stated that Father was arrested and charged with aggravated robbery about a week after P.H.'s birth. Father was detained at the Juvenile Detention Facility until March 29, 2018, The motion stated that SFCS did not have contact with Father at first, but Father eventually met with

SFCS in late June 2018. Father said he was employed and completed a substance abuse evaluation but had not completed a clinical assessment. The motion also stated Father was charged with "pedestrian use sidewalk."

The termination hearing occurred nine months after the State's motion for finding of unfitness. After ruling on two motions in limine and determining the presumption of unfitness applied to Mother, the State presented evidence through 15 witnesses as for Mother's and Father's alleged unfitness. See K.S.A. 2019 Supp. 38-2271(a)(4) ("It is presumed . . . that a parent is unfit . . . if the State establishes, by clear and convincing evidence, that: . . . (4) the parent has been convicted of causing the death of another child . . . ."). Neither Mother nor Father testified.

After hearing the testimony and considering the exhibits, the district court held that Mother and Father were unfit and terminated their parental rights. Specifically, the district court found that Father was unfit due to: "[f]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family [K.S.A. 2019 Supp. 38-2269(b)(7)]" and "[l]lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child [K.S.A. 2019 Supp. 38-2269(b)(8)]." The district court also found that termination of parental rights was in the child's best interests.

Father timely filed this appeal.

ANALYSIS

When reviewing a finding of parental unfitness, this court must determine, after reviewing all of the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re*

3

*K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove a parent is unfit "by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine factors that singularly or in combination may constitute unfitness. K.S.A. 2019 Supp. 38-2269(b), (f). The statute lists four other factors to be considered when, as here, the parent no longer has physical custody of a child. K.S.A. 2019 Supp. 38-2269(c).

On appeal, Father mainly argues that the State failed to properly plead the facts for which the district found him unfit. Father argues that the issue in his case is whether the parent must be given notice "that such conduct is being considered as a reason for termination, and given the opportunity to change such conduct, before it is used as the basis to terminate his rights." Father made a similar argument throughout the termination hearing. Because this is the bulk of his argument, it will be addressed first.

*Father was properly notified of the facts and circumstances for which the district court terminated his parental rights under K.S.A. 2019 Supp. 38-2269(b)(8).*

As noted, the district court terminated Father's parental rights, in part, on the grounds that he lacked effort "to adjust the parent's circumstances, conduct or conditions to meet the needs of the child pursuant to [K.S.A. 2019 Supp. 38-2269(b)(8)]." To support an unfitness finding under this factor, the State presented the testimony of many police officers who testified at length about Father's contact with law enforcement and his reputation within the Wichita Police Department. The State's theory appeared to be that Father lacked effort to adjust his conduct to meet the needs of P.H. because of his

continued negative law enforcement interactions. As to Father's negative interactions with law enforcement, the evidence showed:

- Before P.H.'s birth, police contacted Father after police received a report that persons involved in a car accident fled to a "nearby red shed" where Father was located. Police located three stolen vehicles and other stolen property at the red shed. Police saw Father leave the shed and contacted him. A trooper testified that Father was "very standoffish" when the trooper tried to speak with him and when the conversation "went downhill" his lieutenant stepped in, took custody of Father and interviewed him. Father was never charged with any crimes related to this incident.

- Officers Jamie Thompson and Jeffrey Walters of the Wichita Police Department testified that they were tasked with locating Father and Father's brother after they were named suspects in an aggravated robbery a few weeks after P.H. was born. Officers located Father after seeing him sitting in the passenger seat of a vehicle that Mother was driving. Officers then detained Father and he was interviewed. Upon a search of Mother's home, where Father and his brother resided, police located a bag that contained a social security card for Father's brother, four syringes, and a "spoon that had methamphetamine paraphernalia residue on it." But police did not find any evidence that connected Father to the contents of the bag. Father's brother fled the house, but police eventually apprehended him.

- Walters has responded to reports of "disturbances, suspicious characters, check shots, [and] reports of shots fired that have all been somehow linked to that residence" of Father. That said, Walters has never arrested Father on these other reports.

- Four months after P.H.'s birth, Officers Brek Train and Brandon Faulkner of the Wichita Police Department responded to a riot call at Father's home. Train testified that a woman told police that men associated with an address near Father's had shot at Father's house. After investigating, police concluded that the gunfire was in response to fireworks "being shot off too late" in the street. Train also determined that there was return gunfire from the porch of Father's house because he found cartridge casings on the front porch that were a different caliber than the casings reportedly fired toward Father's home. Police found some casings at a location that "appeared as if they were [being fired] toward the house" while the others were found on the front porch of the house being fired at. Train and Faulkner determined that there were three children residing in the home, but no one suffered any gunshot wounds. Police never arrested or charged Father this incident.

- Six months after P.H.'s birth, Officer Blake McElwain of the Wichita Police Department testified that police received a disturbance call alleging an individual had pointed a gun at Father. Although Father was the victim, McElwain could not contact Father because Father fled and "jumped off a balcony."

- One year after P.H.'s birth, Officer Jax Rutledge of the Wichita Police Department testified that he responded to a traffic accident involving Father. After investigating, Rutledge determined that while Father was driving "at an excessive rate of speed," Father tried to "pass a vehicle by going into oncoming traffic, and that vehicle had then turned in front of him, and he smacked it, and both vehicles went basically off of the road at that point."

Following the accident, Rutledge interviewed Father, and Father gave him inconsistent stories about how the accident occurred. First, he claimed his brakes were not working. Then he claimed he was driving 35 miles per hour. Eventually,

6

Father alleged he was going "40 to 50 miles an hour," but Rutledge determined Father was going 60 miles per hour. Father said he was "just trying to pass the car because he was in a hurry" but also said he was being chased by his brother. After investigating, Rutledge determined that there was no vehicle behind Father during the accident, and Rutledge cited Father for failing to have proof of insurance, driving on a suspended license, and careless driving.

- Malachi Wulf testified that he called police after witnessing an incident about a month after the car accident. Wulf testified that he saw Father and two others driving down the street "at a high rate of speed." The car "had to hit the brakes" because there were two kids in the street. The kids did not get hit, "but they ran up in their yard screaming." A pickup was following the car, and the person inside the pickup "pulled up behind the individuals and was yelling at them something in Spanish." Wulf saw the people in the car "jump out" and the individual sitting in the back seat waved a gun. The car then "did a burnout and accelerated away." Wulf testified that the incident was "crazy" and he had "never seen nothing like that in life." Wulf knew Father was in the car because Father lived across the street from Wulf's sister. It is not clear whether Father was the person waving the gun.

As to Father's reputation within the law enforcement community, the evidence showed:

- Dalena Mar, a social worker for DCF, testified that DCF requested police put P.H. in protective custody after she was born. Mar testified that DCF did not give the police any information about Mother's involuntary manslaughter conviction. Instead, when DCF mentioned that one parent was Father, "the officer automatically responded that he knew who that was and that they didn't have an issue putting the child in police protective custody based on their knowledge of [Father]." Mar testified to other concerns and made recommendations, but the

7

district court found it would "disregard her recommendations" because Mar had not been involved in the case for one year.

- Walters testified that he had interacted with Father several times and he has had "only negative interactions" with Father. Walters testified "[a]nytime that [he] would deal with [Father] under any circumstances for the rest of [his] career, [he] would always use caution more than [he] would an average citizen." Walters explained that Father "obviously [has] a lot of animosity toward law enforcement" because anytime police drove by Father's residence, "it would not be unusual for [Father] to be out in the front yard flipping us off, saying 'Fuck the police,' things of that nature." Walters testified that "veteran officers" who have worked in the area where Father and his brother resided, "had experiences with [Father] enough that they wanted to warn [him] to be careful if [he had] to deal with him."

- McElwain testified that he was familiar with Father before he responded to the disturbance call because of his reputation as a "troublemaker." McElwain testified that officers are advised to use caution when dealing with Father.

- Train testified that he was aware of Father's reputation, despite not working in the area where Father resides. Law enforcement had discussed Father at squad meetings, and Train learned that Father is "known to carry firearms" and Father had been "involved in robberies and chases with the police department." Train testified that he was told "[t]o be cautious" when dealing with Father.

- Faulkner testified that he was familiar with Father's address because it is "[p]robably one of the most well-known addresses to law enforcement in the Planeview area just from the calls that [they] get from that area." Faulkner added that Father is "probably the most well known" individual from this address. Faulkner also testified that Father has a reputation as "[t]roublemaker" within the law enforcement community.

8

Wulf also testified that he had another negative, and allegedly unlawful, encounter with Father involving a gun around three weeks before the termination hearing. Wulf testified that while at his sister's house, Father was outside "revving" the engine of his car. Wulf asked Father if he would "'quiet that down'" because the noise was scaring his two-year-old niece. Wulf testified that he was "told in an unpleasant way to mind [his] own f'ing business." Wulf saw that Father had a gun in his waistband which he pulled out "and had it down by his side" as Wulf walked away. Wulf testified that the incident "just throws [him] off." He added, "Like why did he even pull a gun on a car incident, you know? That's dumb."

As shown, the State presented detailed evidence supporting their claim that Father had a reputation as a troublemaker within the law enforcement community and that he continued to have negative interactions with law enforcement after the birth of P.H. Father does not appear to dispute this evidence. Rather, Father argues the State should have given him notice that his negative law enforcement contact was being considered as a ground for termination because without notice, he was not given a chance to make changes to this behavior. The State argues that Father's argument "defies common sense" and is "illogical." The State maintains that "one of the overriding focuses of a CINC case is to make sure that the parents can provide a *safe* and stable home for their child" and therefore a court should not have to tell Father to "refrain from negative law enforcement contact and stop associating with people involved in criminal activity and illegal drugs."

Father relies on K.S.A. 2019 Supp. 38-2266(b) to support his argument. This subsection states, "Whenever a pleading is filed requesting termination of parental rights or appointment of a permanent custodian, the pleading shall contain a statement of specific facts which are relied upon to support the request, including dates, times and locations to the extent are known." K.S.A. 2019 Supp. 38-2266(b). In the State's motion for finding of unfitness and termination of parental rights, the State alleged the following relevant facts:

- Father failed to provide a safe and stable living environment for P.H.
- There were concerns for P.H.'s safety in Father's care.
- Father had a history of criminal activity.
- Father did not make the necessary changes in lifestyle to keep P.H. safe.
- Father was arrested, and later charged, with aggravated burglary.
- Father was detained at the Juvenile Detention Facility and released on March 29, 2018.
- Father was charged with pedestrian use sidewalk.

The State then requested termination of Father's parental rights on these grounds and alleged facts:

- K.S.A. 2019 Supp. 38-2269(b)(3):  "Father has a history of substance abuse. . . tested positive for THC and benzodiazepine. He admitted marijuana use. . ."
- K.S.A. 2019 Supp. 38-2269(b)(5):  "Father charged with aggravated robbery, a level three (3) person felony . . ."
- K.S.A. 2019 Supp. 38-2269(b)(7):  "The court, DCF, and SFCS have made extensive efforts to assist Father in stabilizing his situation to place him in a position to provide appropriate care to his child. Efforts include referral to complete court orders, case plan tasks, and drug screenings, as well as visitations with his child. . ."
- K.S.A. 2019 Supp. 38-2269(b)(8):  "Father has failed to modify his situation to place him in a position to provide appropriate care for his child. . . . Father has continued to engage in illegal activity and has been charged with aggravated robbery."

Father also cites *In re J.W.*, No. 112,668, 2015 WL 8590309 (Kan. App. 2015) (unpublished opinion), to support his position that parents need to be "notified of

10

conditions which require a change, before those conditions can be used against them to terminate their parental rights." In *In re J.W.*, a panel of this court found that the agency placed in charge of the children's care did not provide "'reasonable efforts'" when they "set up requirements for reintegration which are outside of the parameters of the written permanency plan without amendment of the plan." 2015 WL 8590309, at *11. Father relies on this decision to suggest that Father was "not told of the concern about negative police involvement."

Father's argument is not persuasive. Although there was never a court order or case plan task that directly advised Father to avoid negative law enforcement contact, the State alleged the specific facts relied on to support their argument that Father failed to adjust his conduct to meet the needs of his child. The State specifically alleged Father "continued to engage in illegal activity" as support for their request to terminate his parental rights under K.S.A. 2019 Supp. 38-2269(b)(8). This is distinguishable from *In re J.W.* The court there was considering whether the agency provided reasonable efforts to rehabilitate the family under K.S.A. 2014 Supp. 38-2269(b)(7) when it failed to notify Mother until two weeks before trial that reintegration would not be considered until her boyfriend moved out. In other words, the court was examining whether the agency had fulfilled its responsibilities. 2015WL 8590309 at *11. Here, by highlighting negative law enforcement contacts the district court was focused on whether Father had done enough to adjust his circumstances and conduct to meet the needs of P.H. under K.S.A. 2019 Supp. 38-2269(b)(8)—particularly her safety and security needs.

Additionally, we agree with the State that Father's argument ignores the fact that he consistently lied to his case managers about his contacts with law enforcement. The SFCS caseworker testified that she would ask Father monthly whether he had any law enforcement contact. Father said he did not until the car wreck in late February 2019. The caseworker testified that although he told her about the wreck, she did not learn the truth about the wreck until a week before the termination hearing. Father told the caseworker

11

that he had hydroplaned and denied hitting another car. Similarly, neither parent notified the caseworker when Father was placed in juvenile detention for aggravated robbery, nor was she notified when he was released. She was also never told why Father was placed in juvenile detention. And the caseworker was never told about the fireworks incident leading to the exchange of gunfire.

The evidence presented at trial supports the State's position that Father lacked effort to adjust his circumstances, conduct, or conditions to meet the needs of P.H. Before P.H. was born, Father had established a reputation as a troublemaker within the law enforcement community. After P.H.'s birth, but before P.H. was adjudicated as needing care, Father was arrested and charged with aggravated burglary. After P.H. was adjudicated; gunfire was exchanged at Father's house; an individual pulled a gun on Father, but he fled before police arrived; and Father was involved in a car accident after he swerved into oncoming traffic while illegally trying to pass another car. Together with these incidents reported to police, the State presented testimony that Father pulled a gun on his neighbor's brother after being asked to quiet down.

As argued by the State, Father failed to address the chaos in his life when he continued to engage in behaviors that led to creating an unsafe environment for P.H. When reviewed in a light most favorable to the State, a rational fact-finder could find the district court's decision under K.S.A. 2019 Supp. 38-2269(b)(8) to be highly probable and supported by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. at 705-06.

*Reasonable efforts made by public or private agencies to rehabilitate the family have failed because Father failed to implement secondary change.*

A district court may find a parent unfit if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. K.S.A. 2019 Supp. 38-2269(b)(7). As to this termination ground, Father

12

argues that the "uncontroverted evidence disproved these claims" because Father completed all court orders. The State argues that despite Father completing the court orders, "he was not forthcoming with case workers about his repeated law enforcement contacts or his continued association with individuals associated with criminal activity."

As noted by Father, the district court found that "for all intents and purposes, the parents have complied with the orders of the Court as directed by the caseworker." The State concedes as much. That said, the State argues that Father failed to implement secondary change after completing these orders. This assertion is supported by the record. Along with Father's negative law enforcement contacts, witnesses testified to the following:

- Kristen Peterman, an employee at DCF, defined secondary change as "an internalization" of what a parent has learned in classes or services and "applying what [the parent has] learned to your day-to-day life." Based on the actions of Father, Peterman testified that she was concerned that Father's behavior doesn't "necessarily demonstrate that [he has] an understanding of what [he] learned in classes or therapy." For example, Father is "still associating with individuals who have criminal activity" and having that association puts P.H. at a safety risk. Peterman expressed similar concerns with Father's behavior, stating, "When there are weapons that aren't stored properly, that are shot over a dispute with a neighbor, reckless driving, . . . having law enforcement pursue your car and the parent getting arrested, all of that creates safety risks for the child."

- Alanea Hanna, a social worker for SFCS, testified that she is concerned with Fathers "risky or at-risk behavior" and his failure to implement secondary change. Hanna testified that she believed Father's law enforcement contact "has been to the point where if [P.H.] was present, she would be harmed. . . . [I]f [P.H.] would have been in the home on any of those occasion that we have heard, she could be placed

13

in harm." Hanna testified that although visitations went well with Father, "[v]isitation is different than having a child in your care at all times." Hanna also testified that SFCS had trouble addressing some concerns with Father because Father was not forthcoming with his behavior.

- SFCS caseworker Lavana Faine testified that Father completed all court orders and recommended reintegration. Faine was the only witness to make this recommendation but she recommended reintegration contingent upon SFCS completing a six-month reintegration plan. Faine testified that she was unaware of Father's criminal behavior, despite asking him monthly if he had contact with law enforcement. Faine initially testified that Father implemented secondary change. Yet on cross examination, Faine testified that after hearing all the evidence presented at trial, she has safety concerns for P.H. and conceded that Father has failed to make secondary changes.

When reviewed in a light most favorable to the State, a rational fact-finder could find the district court's decision based on K.S.A. 2019 Supp. 38-2269(b)(7) to be highly probable and supported by clear and convincing evidence. See *In re B.D.-Y.,* 286 Kan. at 705-06. Although Father completed the court ordered tasks, Father failed to implement the secondary change necessary to create a safe environment for P.H. in order to rehabilitate the family.

For all the reasons stated above, we find that clear and convincing evidence supported the district court's finding of parental unfitness as to Father.

Affirmed.

14